## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **ZHAKIM WILLIAMS** | : | **Case No.: 2:19-cv-313-VLB-RAR** |
| | : | |
| **PLAINTIFF** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SOUTH PARK INN, INC.,** | : | |
| **and JEFF KATZ** | : | |
| | : | |
| **DEFENDANTS** | : | **MAY 17, 2019** |

### SECOND AMENDED COMPLAINT

Plaintiff Zhakim Williams brings this action for declaratory and injunctive relief and compensatory damages to remedy Defendants' violation of his rights under Connecticut and Federal fair housing laws. Mr. Williams is an individual with a disability and is homeless. Defendant South Park Inn operates a homeless shelter. Defendants ejected Mr. Williams from its shelter because of Mr. Williams' disability and refused to permit him to return as a reasonable accommodation of that disability. Defendants' actions violate the Fair Housing Amendments Act, 42 U.S.C. § 3601 *et seq.*, and the corresponding Connecticut statute, Conn. Gen. Stat. § 46a-64c *et seq.* As a result of Defendants' negligence and violations of these statutes, Mr. Williams suffered readily foreseeable emotional distress and physical injuries.

## I.      JURISDICTION AND VENUE

1. **This Court has subject matter jurisdiction over Mr. Williams' federal claim under 28 U.S.C. § 1331 because the action arises under the laws of the United States, including 42 U.S.C. § 3601 *et seq*. This Court also has supplemental jurisdiction over Mr. Williams' state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the claims over which this Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This Court is authorized to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201-02.**

2. **Venue is proper under 28 U.S.C. § 1391(b) because the incidents giving rise to this action occurred within this judicial district.**

## II.      PARTIES

3. **Plaintiff Zhakim Williams is a natural person who is homeless. Until February 24, 2019, he resided at the South Park Inn shelter located at 75 Main Street, Hartford, CT.**

4. **Defendant South Park Inn, Inc. ("SPI") is a corporate entity with a business address of 75 Main Street, Harford, CT.**

5. **SPI receives funding through the Emergency Solutions Grant Program ("ESG").**

6. **The U.S. Department of Housing and Urban Development provides ESG funding to municipalities who in turn distribute their ESG funds in smaller grants to shelters.**

7. From July 1, 2017 until June 30, 2018, SPI received $43,465 in ESG funds.

8. From July 1, 2018 until June 30, 2019, SPI received $37,679 in ESG funds.

9. In addition, SPI receives Social Service Block Grant funds from the State of Connecticut Department of Social Services to fund shelter operations.

10. SPI also received funding from the Veterans Affairs Grant and Per Diem Program to fund a total of 10 shelter beds during the relevant period.

11. Upon information and belief, Defendant SPI receives additional federal, state, and or local governmental funding.

12. Defendant Jeff Katz is interim executive director of SPI and has a business address of 75 Main Street, Hartford, CT.

### III.    LEGAL BACKGROUND

13. The Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 *et seq.* ("FHA") prohibits discrimination in the provision of housing services on the basis of "handicap" (hereinafter "disability").

14. Under the FHA, the term disability means, with respect to a person, a "physical or mental impairment which substantially limits one or more of such person's major life activities, a record of such an impairment, or being regarded as having such an impairment."  42 U.S.C. § 3602(h).

15. Physical and mental impairments under the FHA include physical or mental illness and orthopedic impairments. 24 C.F.R. § 100.201. Caring for oneself and walking are major life activities. *Id.*

16. The FHA prohibits conduct that would "make unavailable or deny, a dwelling to any buyer or renter because of a handicap" of that person or

persons residing in or intending to reside that dwelling after it is sold, rented, or made available. 42 U.S.C. § 3604(f)(1).

17. The FHA provides that it is unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of the disability of that person or persons residing in or intending to reside in that dwelling after it is sold, rented, or made available.  42 U.S.C. § 3604(f)(2).

18. It is a violation of 42 U.S.C. § 3604(f)(2) for a housing provider to "refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B).

19. The Connecticut State Fair Housing Act, Conn. Gen. Stat. § 46a-64c *et seq.* ("CTFHA") contains prohibitions on discrimination on the basis of disability that are substantially equivalent to those contained in the FHA. *See* Conn. Gen. Stat. § 46a-64c(a)(6).

20. Negligence per se or statutory negligence occurs when a statute, regulation, or rule meant to protect a class of persons is violated in a willful, reckless, or negligent manner and a person intended to be protected by the statute, regulation, or rule is injured.

21. Negligent infliction of emotional distress occurs when the defendant's conduct creates an unreasonable risk of causing the plaintiff emotional distress; the plaintiff's distress was foreseeable; the emotional distress

was severe enough that it might result in illness or bodily harm; and the defendant's conduct was the cause of the plaintiff's distress.

22. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, et. seq., and the regulations adopted thereunder apply to recipients of federal funds, such as Defendants herein. The Rehabilitation Act prohibits discrimination against people with disabilities, requires a recipient to modify its housing policies and practices to ensure that it does not discriminate on the basis of disability, and requires a recipient to ensure that all services, programs, and activities are readily accessible to persons with disabilities.

## IV.   FACTS

23. Zhakim Williams is a person with a disability. He has been diagnosed with mental health conditions including severe depression, anxiety, and insomnia. As a result, Mr. Williams is susceptible to anxiety and agitation. Mr. Williams is also physically disabled, having recently had back surgery that left him requiring the use of a cane to walk. As a result of his conditions, Mr. Williams is limited in major life activities, including but not limited to walking, sleeping, and caring for himself, and he is limited in his ability to process information and respond to stress.

24. Mr. Williams is homeless.

25. Mr. Williams began residing at Defendants' shelter at 75 Main Street, Hartford, CT in July 2018.

26. On its homepage, Defendant SPI states that "[o]ur mission is to help homeless people improve their lives by providing temporary and long-term housing and supportive services" in large, black, 36-point font.[1]

27. Defendant SPI's homepage also states that "Everyone Deserves A Place To Call Home!" in even larger, black, 48-point font.[2]

28. On August 17, 2018, during Mr. Williams' residence at Defendant SPI, Defendant SPI's website stated that

> No one ever plans on being homeless!  With no where else to go, nearly 1,500 men, women and children find themselves on our doorstep, each year.  Everyone deserves a place to call home. South Park Inn provides a continuum of services from street outreach and emergency shelter to transitional and permanent housing. While staying at South Park Inn residents' basic needs are met and they work to overcome the problems that led to their homelessness.[3]

29. Under Defendant SPI's policies, temporary residents of SPI are given 30 days to search for housing and, if they are considered "employable," employment.

30. After 30 days, Defendant SPI works with residents to find housing and employment.

31. Mr. Williams was exempt from having to search for employment based on his disability.

---

[1] South Park Inn, www.southparkinn.org (last visited on May 15, 2019).
[2] Id.
[3] Wayback Machine Internet Archive, South Park Inn, https://web.archive.org/web/20180817204712/http://southparkinn.org/ (last visited on May 15, 2019).

32. Residents are given up to 90 days from the date of admission to search for housing and employment, after which time they are required to have a review with their caseworker.

33. During the review, residents and SPI staff review residents' progress in applying for housing or employment, the status of those applications, and whether any follow up is required so that shelter staff can contact the housing providers or employers on behalf of residents.

34. Mr. Williams was searching for housing before being admitted to Defendant SPI, within the 30-day window, and continued to search for housing throughout his time at the shelter.

35. Because Defendant SPI did not schedule a review with Mr. Williams, Mr. Williams was forced to make several attempts to schedule a review with Defendant SPI.

36. Mr. Williams' review took place shortly before Thanksgiving of 2018, although it likely should have occurred in October.

37. Mr. Williams met with Audrey Kennedy for his review.

38. Mr. Williams and Ms. Kennedy reviewed Mr. Williams' efforts to search for housing, including updates on recent applications.

39. Defendant SPI did not follow up with Mr. Williams after the 90-day review and did not tell him whether it would extend or terminate his stay.

40. As a result, Mr. Williams had the expectation that he would be able to reside at SPI indefinitely if he was searching for housing.

41. Residents of Defendant SPI who are considered employable are required to perform chores as a consideration of their residence. Mr. Williams was exempt from performing chores on account of his disability.

42. Although Defendant SPI normally requires residents to vacate during daytime hours, individuals with disabilities are included on a "protected" list which permits them to remain at the shelter during the day.

43. At more than one time during his stay at SPI, Mr. Williams believes he was improperly required or pressured to leave during the day despite his inclusion on that list.

44. On February 24, 2019, Mr. Williams believed he and others were being asked to leave the shelter despite their right to stay, something third shift workers had indicated to the residents they would be allowed to do due to the inclement weather.

45. First shift workers, however, informed them that they would need to leave.

46. Mr. Williams voiced concern about being asked to leave to a fellow resident.

47. Although Mr. Williams' comment was not directed to her, an SPI staff member, Audrey Kennedy, asked Mr. Williams to repeat what he had said to the other resident.

48. When Mr. Williams repeated that he didn't believe he, or others, should be asked to leave the shelter, Ms. Kennedy responded that she could take him off the protected list.

49. Mr. Williams responded that if she did, she would get in trouble because he has a disability and he would report her.

50. In response, Ms. Kennedy stated that Mr. Williams had lost his bed and told him to leave the shelter.

51. Ms. Kennedy did not provide written notice of his termination from the shelter or offer any grievance or appeal process.

52. Ms. Kennedy called the Hartford police via 9-1-1 in order to remove Mr. Williams from the shelter.

53. Police records reflect that the call commenced at 9:21 a.m.

54. The police report states that Ms. Kennedy reported that Mr. Williams was "being disruptive and being argumentative with everyone there."

55. At 9:25 a.m., police records reflect that the call was cancelled by Ms. Kennedy because Mr. Williams had left the premises.

56. On the 9-1-1 call, Ms. Kennedy twice reported to the dispatcher that Mr. Williams was not a threat.

57. Ms. Kennedy also reported that Mr. Williams was being disruptive by trying to have a "housing meeting" with her.

58. The expulsion from the shelter and call to police triggered significant anxiety for Mr. Williams.

59. The only time Mr. Williams raised his voice was to attempt to project it so that the dispatcher for the police could hear his side of the story.

60. Mr. Williams left the shelter and remained in the vicinity for the next two hours. He stood outside in the rain. He never observed the police respond.

61. Mr. Williams then spent the night of February 24, 2019 outside in Constitution plaza in Hartford. The temperature dropped to about 37 degrees that night and it rained the following morning.

62. Mr. Williams slept outside from February 24 until Thursday, March 7, 2019, except for Tuesday, March 5.

63. Over the course of that time, Mr. Williams spent nights variously in an unlocked apartment hallway on Bedford Street, around Albany Avenue, in the downtown area of Hartford, in a bus stop in East Hartford, on Capital Avenue in Hartford, and by walking around on the streets.

64. The weather conditions during this period are described in the attached Appendix A from information provided by the National Weather Service.

65. When Mr. Williams was ejected from SPI, he had run out of SNAP benefits and had no way to eat regular meals. From February 24 until Monday, March 3, 2019, Mr. Williams was only able to eat at most one regular meal per day. Moreover, his food stamps do not allow him to purchase hot drinks or hot meals and he was only able to purchase packaged snacks and drinks after he received additional SNAP benefits on March 3.

66. Mr. Williams repeatedly requested that SPI allow him to return.

67. On March 1, 2019, James Dresser, an employee of the Connecticut Fair Housing Center, called SPI on Mr. Williams's behalf and spoke to Ms. Kennedy.

68. Mr. Dresser asked that she allow Mr. Williams back into SPI.

69. Ms. Kennedy refused.

70. **Ms. Kennedy indicated Mr. Williams was expelled for being "boisterous" and "inciting other residents" and that expulsion from the shelter was proportionate because she claimed that Mr. Williams had used a swear word and she perceived that this scared other shelter residents.**

71. **Ms. Kennedy admitted that she told Mr. Williams he could be removed from the protected list in response to his complaint.**

72. **After that call, March 1, 2019, Mr. Dresser sent a letter to Defendant Jeff Katz via email asking SPI to allow Mr. Williams to return as a reasonable accommodation of his disability. A copy of the reasonable accommodation request is attached as Exhibit A.**

73. **In response to this letter, on March 1, 2019, Defendant Katz called Mr. Dresser.**

74. **In the call, Defendant Katz stated that his staff may not be prepared to deal with people with mental health conditions like Mr. Williams.**

75. **Nonetheless, Mr. Katz refused to allow Mr. Williams to return.**

76. **Mr. Katz never spoke to Mr. Williams before making this decision and did not, prior to denying the reasonable accommodation request, contact a witness identified to him by Mr. Dresser.**

77. **Defendants did not review the 9-1-1 call until March 6, 2019.**

78. **On March 6, 2019, Defendants offered to allow Mr. Williams back into the shelter but conditioned their offer on Mr. Williams agreeing to dismissal of this action.**

79. Mr. Williams believed he obtained alternate housing on March 5, 2019, but because of an error, Mr. Williams was denied entry into an alternate shelter.

80. As a result, Mr. Williams was forced to walk from the south end of Hartford toward the warming center in the north end of Hartford at approximately 11:00 p.m. that night.

81. Mr. Williams fell and injured himself during this walk.

82. Mr. Williams also suffered severe emotional distress. During the walk to the warming center, Mr. Williams seriously contemplated suicide and considered walking into traffic, but a helpful bystander allowed him into a building lobby to warm up.

83. Mr. Williams entered another shelter on March 7, 2019 with assistance from officials from the State of Connecticut.

84. As a result, Mr. Williams was on the streets from February 24, 2019 until March 7, 2019, including during a snowstorm that blanketed the Harford area with up to a foot of snow on the night of March 3 and morning of March 4. Mr. Williams has slept in such places as hallways, benches, and a bus shelter.

85. Defendants have acted with callous disregard for Mr. Williams's rights under state and federal fair housing laws.

## COUNT I

### VIOLATION OF 42 U.S.C. § 3604(f)(1)-(3)

86. Mr. Williams incorporates by reference paragraphs 1 – 85.

87. Defendants have discriminated against Mr. Williams based on his disabilities in violation of the Fair Housing Act by making housing unavailable to him, subjecting him to different terms and conditions, and refusing to make a reasonable accommodation in violation of 42 U.S.C. §§ 3604(f)(1)-(3).

## COUNT II

### VIOLATION OF CONN. GEN. STAT. § 46a-64c

88. Mr. Williams incorporates by reference paragraphs 1 – 85.

89. Defendants have discriminated against Mr. Williams based on his disabilities in violation of the CTFHA by making housing unavailable to him, subjecting him to different terms and conditions, and refusing to make a reasonable accommodation in violation of Conn. Gen. Stat. §§ 46a-64c(a)(6)(A)-(C).

## COUNT III

### VIOLATION OF 42 U.S.C. § 3617

90. Mr. Williams incorporates by reference paragraphs 1 – 85.

91. Defendants have discriminated against Mr. Williams in violation of 42 U.S.C. § 3617 by threatening to remove him from the protected list and subsequently excluding him from the SPI shelter entirely as retaliation for his asserting his fair housing rights by voicing an objection to being asked to leave the shelter during the day and threatened with loss of his place on the protected list for individuals with disabilities.

92. Defendants further discriminated against Mr. Williams in violation of 42 U.S.C. § 3617 by offering to allow him to return to the shelter in exchange for dismissal of the lawsuit.

## COUNT IV

### VIOLATION OF CONN. GEN. STAT. § 46a-64c(a)(9)

93. Mr. Williams incorporates by reference paragraphs 1 – 85.

94. Defendants have discriminated against Mr. Williams in violation of Conn. Gen. Stat. § 46a-64c(a)(9) by threatening to remove him from the protected list and subsequently excluding him from the SPI shelter entirely as retaliation for his asserting his fair housing rights by voicing an objection to being asked to leave the shelter during the day and threatened with loss of his place on the protected list for individuals with disabilities.

## COUNT V

### NEGLIGENCE PER SE / STATUTORY NEGLIGENCE

95. Mr. Williams incorporates by reference paragraphs 1 – 85.

96. Defendants owe a duty of care to their shelter residents to manage the shelter in accordance with applicable laws and regulations.

97. The Connecticut Department of Social Services has enacted regulations governing emergency shelter services at R.C.S.A. §§ 17b-800-1 through 17b-800-7. These regulations provide, in part, for shelter residents to have due process rights. The regulations are designed to protect shelter

residents from improper ejectment, given that shelters are not subject to summary process requirements.

98. Defendants owed a duty of care to Mr. Williams to operate Defendant SPI in accordance with the regulations governing emergency shelter services.

99. SPI is an "emergency shelter" as defined in R.S.C.A. § 17b-800-1(7).

100.      Mr. Williams is a "client" as defined in R.S.C.A. § 17-b-800-1(2).

101.      Mr. Williams, as a shelter client, is within the class of persons intended to be protected by the shelter regulations.

102.      As a condition of funding, SPI is required to "maintain records of the use of the grievance procedure." R.S.C.A. § 17b-800-3(d).

103.      SPI is required to follow procedures before expelling or suspending shelter clients. R.S.C.A. §§ 17b-800-5, 17b-800-6. It must maintain and post in a conspicuous location its grievance policy. *Id.* That policy must identify the penalties for violating house rules, e.g. expulsion or suspension, and the length of any applicable suspension. *Id.*

104.      Clients may only be expelled or suspended for "good cause." R.S.C.A. § 17b-800-5(c).

105.      Clients may only be expelled or suspended without prior written notice or an opportunity for a hearing if a shelter employee determines, after consultation with an impartial staff person, that the client poses a threat to the health or safety of other clients, shelter staff, anyone on the grounds of the shelter, or physical property on the shelter grounds. R.S.C.A. § 17b-800-5(e).

106.    Shelters are given discretion to define what constitutes a threat to

health or safety, but examples given in the regulation include:

(1)    Possession, distribution, or use of illegal drugs or alcohol;
(2)    Possession of a dangerous weapon;
(3)    Physical assault or the threat of physical violence when there is
       reason to believe such a threat indicates a genuine possibility of
       actual physical assault directed at anyone in or on the grounds of
       the shelter; and
(4)    Arson or attempted arson.

R.S.C.A. § 17b-800-5(g).

107.    Even in circumstances rising to a threat to health or safety  that

permit expulsion without prior written notice and a grievance hearing , the

shelter is still required to provide post-expulsion notice in accordance with

R.S.C.A. § 17b-800-5(h). In addition, a client is entitled to a post-expulsion

grievance hearing in such circumstances. *Id.* at subsection (i).

108.    SPI violated the following subsections of the grievance process,

R.S.C.A. § 17b-800-5:

109.    SPI violated subsection (c) by expelling Mr. Williams without good

cause. Mr. Williams was expelled in retaliation for exercising (1) his First

Amendment rights to free speech in a state and federally funded institution

and (2) his rights to remain in the shelter during the day as a person with

disabilities.

110.    SPI violated subsection (d) by failing to provide proper advance

written notice and an opportunity for a grievance hearing.

111.     SPI violated subsection (e) by expelling Mr. Williams without advance written notice because Mr. Williams  did not constitute a threat to the health or safety of anyone or any property at the shelter.

112.     SPI violated subsection (h) by failing to provide post-expulsion written notice.

113.     SPI violated subsection (i) by failing to provide an opportunity for a post-expulsion grievance hearing.

114.     Finally, SPI violated R.S.C.A. 17-b-800-7 by failing to provide any appeals process for Mr. Williams.

115.     Mr. Williams suffered injuries that were reasonably foreseeable as a result of Defendants' negligence.

116.     On February 24, 2019, Mr. Williams was improperly ejected from the shelter and remained homeless and living on the street or with friends until March 7, 2019. During this period, Mr. Williams suffered physical injuries and emotional distress.

117.     Mr. Williams spent a night under a bridge during a snow storm.

118.     Mr. Williams endured exposure to extreme conditions, including

a.  below freezing temperatures for 10 days from February 25, 2019 to the conclusion of his homelessness on March 7, 2019;

b.  six days with rain or snow; and

c.  two days where wind speeds exceeded 20 miles per hour.

119.     The injuries that resulted from Defendants' violations of Mr. Williams' rights under the shelter regulations are the types of injuries that the shelter regulations were intended to prevent.

120.     The injuries suffered by Mr. Williams were the reasonably foreseeable consequences of the Defendants' statutory negligence.

121.     Defendants have acted with reckless disregard for their obligations under the shelter regulations.

122.     Defendants had multiple opportunities readmit Mr. Williams but refused to do so.

123.     Defendants are liable for Mr. Williams's injuries.


## COUNT VI

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

124.     Mr. Williams incorporates by reference paragraphs 1 – 123.

125.     Defendants' conduct in failing to follow the emergency shelter regulations created an unreasonable risk that their violations of the regulations would cause Mr. Williams emotional distress.

126.     Defendants' conduct in violating the civil rights afforded Mr. Williams under the FHA and CTFHA created an unreasonable risk that Mr. Williams would suffer emotional distress.

127.     It was foreseeable that an individual ejected onto the street with no shelter during winter would face the risk of suffering severe emotional distress and physical injuries.

128.     It was similarly foreseeable that an individual deprived of his rights under the FHA and CTFHA in a manner that caused him to spend nights on the street in winter would face the risk of suffering severe emotional distress and physical injuries.

129.     Moreover, the emotional distress Mr. Williams suffered by living on the street in the winter, attendant sleep deprivation and discomfort, and suicidal thoughts were severe enough that they could have resulted in illness or bodily harm.

130.     The emotional distress was caused by the acts of the Defendants through their violations of the FHA, CTFHA, and the emergency shelter regulations.

<u>**COUNT VII**</u>

**TITLE III OF THE AMERICANS WITH DISABILITIES ACT**

131.     Mr. Williams incorporates by reference paragraphs 1 – 85.

132.     Title III of the ADA provides that "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation" 42 U.S.C. § 12182(a).

133.     Mr. Williams is an individual with a disability.

134.     Defendant SPI is a "public accommodation" within the meaning of 42 U.S.C. § 12181(7)(K) ("The following private entities are considered public

accommodations for purposes of this subchapter[:]…a … homeless shelter…").

135.    Defendants have violated Title III of the ADA and the implementing regulations by:

    a.  Refusing to make reasonable modifications in their policies, practices, or procedures necessary to afford Mr. Williams access to the services and privileges offered by Defendants; and

    b.  Adopting and enforcing or refusing to adopt and enforce policies and practices designed and intended to ensure that Mr. Williams had access to and enjoyment of emergency shelter services in a manner equal to those without disabilities.

136.    Defendants' conduct proximately caused harm to Mr. Williams, who suffered discrimination, physical injuries, and emotional distress.

## COUNT VIII

### SECTION 504 OF THE REHABILITATION ACT

137.    Mr. Williams incorporates by reference paragraphs 1 – 85.

138.    Section 504 of the Rehabilitation Act prohibits recipients of federal funding from denying to qualified persons with disabilities the benefits provided by the recipient, or from subjecting persons with disabilities to discrimination. 29 U.S.C. § 794(a).

139.    Defendants receive federal financial assistance in connection with their management of the emergency shelter system and other programs and services, and are therefore subject to 29 U.S.C. § 794(a).

140.     Defendants' operations constitute a "program or activity" within the meaning of 29 U.S.C. § 794(b).

141.     Mr. Williams is a qualified individual with a disability as defined by 29 U.S.C. § 705(20).

142.     Defendants have violated the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, and the implementing regulations, 24 C.F.R. § 8.24, by:

   a. Discriminating against Mr. Williams because of his disability, including by refusing to grant Mr. Williams' request for a reasonable accommodation; and

   b. Failing to develop or maintain policies, procedures, and practices that ensure staff of Defendant SPI are capable of working with people who have mental disabilities.

143.     Defendants' conduct proximately caused harm to Mr. Williams, who suffered discrimination, physical injuries and emotional distress.

## RELIEF

Wherefore, Mr. Williams requests that the Court:

   a.     Enter a declaratory judgment finding that the actions of Defendants alleged in the Complaint violate 42 U.S.C. § 3601 *et seq.*, Conn. Gen. Stat. 46a-64c *et seq.*, 42 U.S.C. § 12181 *et seq.*, 29 U.S.C. § 701 *et seq.*, and Connecticut common law;

   b.     Enter a permanent injunction prohibiting Defendants from discriminating against Mr. Williams based on his disability;

c.      Enter a permanent injunction prohibiting Defendants from retaliating against Mr. Williams and requiring Defendants to take all affirmative steps necessary to remedy the effects of the illegal discriminatory conduct alleged in this Complaint and to prevent repeated occurrences in the future;

f.      Award compensatory damages in an amount that would fully compensate Mr. Williams for his economic losses and the humiliation, embarrassment, physical suffering, and emotional distress and mental anguish caused by Defendants' violations of the law alleged in the Complaint pursuant to 42 U.S.C. § 3613(c), Conn. Gen. Stat. § 46a-98a, 42 U.S.C. § 12188, 29 U.S.C. § 794a, and Connecticut common law;

g.      Award punitive damages in an amount that would punish Defendants for the willful, wanton, and reckless misconduct alleged in this Complaint and that would effectively deter it from future discriminatory behavior pursuant to 42 U.S.C. § 3613(c) and Conn. Gen. Stat. § 46a-98a, 42 U.S.C. § 12188, and 29 U.S.C. § 794a;

h.      Award Mr. Williams reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c) and Conn. Gen. Stat. § 46a-10442 U.S.C. § 12188, and 29 U.S.C. § 794a;

i.      Order all other relief deemed just and equitable by the Court.

**Respectfully Submitted,**
**PLAINTIFF ZHAKIM WILLIAMS**

**By Counsel: _____/s/_____**
                **Greg Kirschner (ct26888)**
                **David Lavery (ct29971)**
                **The Connecticut Fair Housing Center**
                **60 Popieluszko Court**
                **Hartford, CT 06106**
                **(860) 263-0724 / (860) 247-4236 (F)**
                **gkirschner@ctfairhousing.org**
                **dlavery@ctfairhousing.org**